# EXHIBIT 2



Troutman Sanders LLP
600 Peachtree Street NE, Suite 3000
Atlanta, GA 30308-2216

troutman.com

**J. Evan Gibbs III**
evan.gibbs@troutman.com

August 22, 2018

**VIA FEDERAL EXPRESS**

David K. Jenson
5755 South Truckee Court
Centennial, Colorado 80015

AND

15249 East Stanford Place
Aurora, Colorado 80015

Re: **Jenson v. The Green Solution (TGS) and Eddie Carraro
Demand for Mediation**

Dear Mr. Jenson:

My firm represents TGS Management, LLC (misidentified in your Complaint and Amended Complaint as "The Green Solution (TGS)") and Eddie Carraro (collectively, the "Defendants") in the lawsuit you have filed against them in the U.S. District Court for the District of Colorado, Case No. 1:18-cv-01240. Please direct all future communications concerning this matter to me.

As you may recall, on April 13, 2016, you executed an agreement with TGS Management, LLC memorializing important terms and conditions relating to your employment. An executed copy of the agreement is enclosed for your reference. Pursuant to Section 21.2 of the agreement, the Defendants hereby demand mediation of all of your claims against them. As set forth in Section 21.2, all claims not resolved through mediation within 60 days of service of this demand will be subject to binding arbitration.

If you are now represented by counsel, please immediately forward this correspondence to him or her. If you are not represented by counsel, I can be reached at (404) 885-3093, or via email at: evan.gibbs@troutman.com to discuss this demand and mediation.



Thank you.

Sincerely,

J. Evan Gibbs III

Enclosure (1)

# AT-WILL EMPLOYMENT TERMS AND CONFIDENTIALITY AGREEMENT

This At-will Employment Terms and Confidentiality Agreement (this "**Agreement**") is made in consideration for my employment or continued employment by TGS MANAGEMENT, LLC, a Colorado limited liability company, and its subsidiaries and assigns ("**Company**"), and the compensation now and hereafter paid to me. I hereby agree as follows:

1. CONFIDENTIALITY.

   1.1. NONDISCLOSURE; RECOGNITION OF COMPANY'S RIGHTS. At all times during my employment and thereafter, I will hold in confidence and will not disclose, use, communicate, lecture upon, or publish any Confidential Information (as hereinafter defined), except as such use is required in connection with my work for Company, or unless the Manager of Company (the "**Manager**") expressly authorizes in writing such disclosure or publication. I will obtain the Manager's written approval before disclosing, publishing or submitting for publication any material (written, oral, or otherwise) that relates to my work at Company and/or incorporates any Confidential Information. I hereby assign to Company and Client (as hereinafter defined) any rights I have or acquire in any and all Confidential Information and recognize that all Confidential Information shall be the sole and exclusive property of Company and its Clients. The provisions of this Section shall survive the termination of my employment.

   1.2. ACKNOWLEDGMENT. I acknowledge that during my employment with Company, I will have access to Confidential Information, all of which shall be made accessible to me only in strict confidence; that unauthorized disclosure of Confidential Information will damage Company's and/or Client's business; that Confidential Information would be susceptible to immediate competitive application by a competitor of Company's or Client's; that Company's or Client's business is substantially dependent on access to and the continuing secrecy of Confidential Information; that Confidential Information is novel, unique to Company and Clients and known only to me, Company, Client, and certain key employees and contractors of Company and Client; that Company and/or Client shall at all times retain ownership and control of all Confidential Information; and that the restrictions contained in this Agreement are reasonable and necessary for the protection of Company's and Client's legitimate business interests, including the protection of Trade Secrets (as hereinafter defined).

   1.3. CONFIDENTIAL INFORMATION. "**Confidential Information**" means all non-public information (whether in paper or electronic form, or contained in my memory, or otherwise stored or recorded) relating to or arising from Company's or Client's Business (defined below), and also includes but is not limited to any Trade Secrets used, developed or acquired by Company or Client in connection with its business. Without limiting the generality of the foregoing, "Confidential Information" shall specifically include (a) all non-public information concerning the manner and details of Company's or Client's operation, organization and management; (b) financial information and/or documents and nonpublic policies, procedures and other printed, written or electronic material generated or used in connection with Company's or Client's business; (c) information regarding products, building and development plans, cost sheets, land acquisitions, plans for research and development, marketing and business plans, budgets, and financial statements; (d) the identities of Company's or Client's customers and the specific individual customer representatives with whom Company or Client works and the details of Company's or Client's relationship with such customers and customer representatives; (e) the identities of distributors, contractors, subcontractors, joint venture and strategic alliance parties, and vendors utilized in Company's or Client's business and the details of Company's or Client's relationships with such distributors, contractors, subcontractors, joint venture and strategic alliance parties, and vendors; (f) the nature of fees and charges made to Company's or Client's customers; (g) nonpublic forms, contracts and other documents used in Company's or Client's business; (h) all information concerning Company's or Client's employees, agents and contractors, including without limitation such persons' compensation, benefits, skills, abilities, experience, knowledge and shortcomings, if any; (i) the nature and content of computer software used in Company's or Client's business, whether proprietary to Company and/or Client or used by Company and/or Client under license from a third party; (j) inventions, ideas, processes, computer source and object code, data,

recipes, formulae, plant genetics, programs, other works of authorship, know-how, improvements, discoveries, developments, designs, and techniques; and (k) all other non-public information concerning Company's or Client's concepts, prospects, customers, employees, agents, contractors, subcontractors, earnings, products, services, equipment, systems, and/or prospective and executed contracts and other business arrangements. Confidential Information also includes anything defined hereunder as a Trade Secret, and any Third Party Information. "Confidential Information" does not include information that is in the public domain through no wrongful act on the part of me.

1.4. TRADE SECRETS. "Trade Secret" means all non-public information whether tangible or intangible related to the products, services or business of Company that (a) derives economic value, actual or potential, from not being generally known to or readily ascertainable by other persons who can obtain economic value from its disclosure or use; or (b) is the subject of efforts by Company that are reasonable under the circumstances to maintain its secrecy, which might include, (1) marking any information reduced to tangible form clearly and conspicuously with a legend identifying its confidential or trade secret nature; (2) identifying any oral communication as confidential or secret immediately before, during, or after such oral communication; or (3) otherwise treating such information as confidential or secret. Assuming the criteria in clauses (1), (2) or (3) above are met, Trade Secrets includes information, without regard to form, including, but not limited to, technical and nontechnical data, building and development plans, cost sheets, recipes, formulae, plant genetics, patterns, designs, compilations, computer programs and software, devices, inventions, methods, techniques, drawings, systems, processes, financial data, financial plans, product plans, lists of actual or potential customers and suppliers which are not commonly known by or available to the public, research, development, and existing and future products.

1.5. RECORDS CONTAINING CONFIDENTIAL INFORMATION. "Confidential Records" means all documents and other records, whether in paper, electronic or other form, that contain or reflect any Confidential Information. All Confidential Records prepared by or provided to me are and shall remain Company's property. Except in connection with and in furtherance of my work on Company's behalf or with Company's prior written consent, I shall not, at any time, directly or indirectly: (a) copy or use any Confidential Record for any purpose; or (b) show, give, sell, disclose or otherwise communicate any Confidential Record or the contents of any Confidential Record to any person or entity. Upon the termination of my employment with Company, or upon Company's request, I shall immediately deliver to Company or its designee (and shall not keep in my possession or deliver to any other person or entity) all Confidential Records and all other Company property in my possession or control. I understand and agree that compliance with this Section may require that data be removed from my personal computer equipment. Consequently, upon reasonable prior notice, I agree to permit the qualified personnel of Company and/or its contractors access to such computer equipment for that purpose. This Agreement shall not prohibit me from complying with any subpoena or court order, provided that I shall at the earliest practicable date provide a copy of the subpoena or court order to Company's Manager, it being the parties' intention to give Company a fair opportunity to take appropriate steps to prevent the unnecessary and/or improper use or disclosure of Confidential Information and Confidential Records, as determined by Company in its sole discretion.

1.6. THIRD PARTY INFORMATION. I understand, in addition, that Company has received and in the future will receive, from third parties, Confidential Information ("**Third Party Information**") subject to a duty on Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. During the term of my employment and thereafter, I will hold Third Party Information in strict confidence and will not disclose to anyone (other than Company personnel who need to know such information in connection with their work for Company) or use, except in connection with my work for Company, Third Party Information, unless expressly authorized by the Manager of Company in writing.

1.7. NO IMPROPER USE OF INFORMATION OF PRIOR EMPLOYERS AND OTHERS. I represent that my employment by Company, and assignment to any Client, does not and will not breach any agreement with any former employer, including any non-compete agreement or any agreement to keep in confidence information acquired by me in confidence or trust prior to my employment by Company. I further represent that I have not

entered into, and will not enter into, any agreement, either written or oral, in conflict herewith. During my employment by Company, I will not improperly use or disclose any confidential information or trade secrets of any former employer or other third party to whom I have an obligation of confidentiality, and I will not bring onto the premises of Company or use any unpublished documents or any property belonging to any former employer or other third party to whom I have an obligation of confidentiality, unless consented to in writing by that former employer or person. I will use in the performance of my duties only information that is generally known and used by persons with training and experience comparable to my own, is common knowledge in the industry or otherwise legally in the public domain, or is otherwise provided or developed by Company.

2. INVENTIONS.

2.1. INVENTIONS AND PROPRIETARY RIGHTS. As used in this Agreement, the term "**Invention**" means any ideas, concepts, information, materials, processes, systems, data, programs, know-how, improvements, discoveries, developments, designs, artwork, recipes, formulae, other copyrightable works, and techniques and all Proprietary Rights therein. The term "**Proprietary Rights**" means all trade secrets, copyrights, trademarks, mask work rights, patents and other intellectual property rights recognized by the laws of any jurisdiction or country.

2.2. PRIOR INVENTIONS. I agree that I will not incorporate, or permit to be incorporated, Prior Inventions (as hereinafter defined) in any Company Inventions (as hereinafter defined) without Company's prior written consent. In addition, I agree that I will not incorporate into any Company software or otherwise deliver to Company any software code licensed under the GNU, GPL or LGPL or any other license that, by its terms, requires or conditions the use or distribution of such code on the disclosure, licensing, or distribution of any source code owned or licensed by Company. I have disclosed on Exhibit A a complete list of all Inventions that I have, or I have caused to be, alone or jointly with others, conceived, developed, or reduced to practice prior to the commencement of my employment by Company, in which I have an ownership interest or which I have a license to use, and that I wish to have excluded from the scope of this Agreement (collectively referred to as "**Prior Inventions**"). If no Prior Inventions are listed in Exhibit A, I warrant that there are no Prior Inventions. If, in the course of my employment with Company, I incorporate a Prior Invention into a Company process, machine or other work, I hereby grant Company a non-exclusive, perpetual, fully-paid and royalty-free, irrevocable and worldwide license, with rights to sublicense through multiple levels of sublicensees, to reproduce, make derivative works of, distribute, publicly perform, and publicly display in any form or medium, whether now known or later developed, make, have made, use, sell, import, offer for sale, and exercise any and all present or future rights in, such Prior Invention. I specifically agree to indemnify and hold harmless Company and Client from any losses or damages incurred by a breach of this provision, including any attorneys' fees.

2.3. ASSIGNMENT OF COMPANY INVENTIONS. Subject to Sections 2.2 and 2.5, I hereby assign and agree to assign in the future (when any such Inventions or Proprietary Rights are first reduced to practice or first fixed in a tangible medium, as applicable) to Company and Client all my right, title, and interest in and to any and all Inventions (and all Proprietary Rights with respect thereto) made, conceived, reduced to practice, or learned by me, either alone or with others, during the period of my employment by Company and assignment to Client. Inventions assigned to Company or to a third party as directed by Company pursuant to the section titled "Government or Third Party" are referred to in this Agreement as "**Company Inventions.**"

2.4. OBLIGATION TO KEEP COMPANY INFORMED. During the period of my employment and for two (2) years thereafter, I will promptly and fully disclose to Company in writing (a) all Inventions authored, conceived, or reduced to practice by me, either alone or with others, and (b) all patent applications filed by me or in which I am named as an inventor or co-inventor.

2.5. GOVERNMENT OR THIRD PARTY. I also agree to assign all my right, title, and interest in and to any particular Company Invention to a third party, including without limitation the United States, as directed by Company.

3

2.6. ENFORCEMENT OF PROPRIETARY RIGHTS AND ASSISTANCE. During the period of my employment and thereafter, I will assist Company in every proper way to obtain and enforce United States and foreign Proprietary Rights relating to Company Inventions in all countries. In the event Company is unable to secure my signature on any document needed in connection with such purposes, I hereby irrevocably designate and appoint Company and its duly authorized officers and agents as my agent and attorney in fact, which appointment is coupled with an interest, to act on my behalf to execute and file any such documents and to do all other lawfully permitted acts to further such purposes with the same legal force and effect as if executed by me.

3. LEASED EMPLOYEE STATUS AND COLORADO AND FEDERAL LAW ACKNOWLEDGEMENTS.

3.1. LEASED EMPLOYEE STATUS. I acknowledge that I am an at-will employee of TGS Management, LLC (Company), which is an employee leasing company. There is no direct employment between me and any customers or clients of Company (including but not limited to any subsidiary, affiliate or assign of such customers or clients) that may directly or indirectly receive the benefit of my services pursuant to any employee leasing agreement between Company and any of such customers or clients ("**Client**"). I understand and agree that no representative of such Client has authority to enter into any agreement for employment with me which alters my status as an at-will employee Company. I acknowledge that the terms of this Agreement concerning confidentiality, inventions, notice and non-disparagement apply to any party that receives the benefit of my services pursuant to an employee leasing agreement between Company and such party, as if such party were itself Company.

3.2. COLORADO AND FEDERAL LAW. I acknowledge that Client may be engaged in the business of cultivating and supplying marijuana and/or marijuana infused products in a manner consistent with Colorado laws, rules and regulations (that are subject to drastic change and regulatory development) and require strict compliance by all participating parties, including myself. Colorado law requires such Client to maintain high security facilities that are constantly monitored with alarm and video surveillance systems in order to prevent theft and other illegal behavior; Company and/or Client will immediately report any suspected illegal activity by me to law enforcement. I understand that the business of cultivating and supplying marijuana and marijuana infused products remains unlawful under federal law and it is important for me to consult with my own independent legal counsel regarding any legal risks that could result from my employment with Company or assignment to Client.

4. RECORDS. I agree to keep and maintain adequate and current records (in the form of notes, sketches, drawings and in any other form that is required by Company) of all Inventions made by me during the period of my employment by Company, which records shall be available to, and remain the sole property of, Company and Client at all times.

5. COVENANT OF NON-DISPARAGEMENT. I shall not at any time make any oral or written statement (including via any Internet blog, social network or other media outlet) that disparages or reflects negatively upon Company or Client, or any past, present or future Company and/or Client owner, employee, officer, manager or director, including, without limitation, statements concerning work performance, business practices or personnel decisions, unless required by applicable law. I covenant never to harass or behave unprofessionally toward any past, present or future Company and/or Client owner, employee, officer, manager or director.

6. RETURN OF COMPANY PROPERTY. Upon termination of my assignment to Client, termination of my employment, or upon Company's request at any other time, I will deliver to Company all of Company's and/or Client's property, equipment, documents, and Confidential Records together with all copies thereof, and any other material containing or disclosing any Inventions, Third Party Information or Confidential Information of Company and certify in writing that I have fully complied with the foregoing obligation. I agree that I will not copy, delete, or alter any information contained upon my Company computer before I return it to Company. I further agree that any property situated on Company's or Client's premises, whether or not owned by Company or Client, is subject to inspection by Company or Client personnel at any time with or without notice. Prior to

leaving, I will cooperate with Company in attending an exit interview and completing and signing Company's termination statement.

7. **RETURN OF STATE PROPERTY.** Upon termination of my employment or upon the State Licensing Authority's or the Marijuana Enforcement Division's demand, I will deliver to the State Licensing Authority any and all State Licensing Authority issued identification badges. These identification badges are the property of the State Licensing Authority and I will not alter, obscure, damage, or deface the badge in any manner.

8. **NOTIFICATION OF NEW EMPLOYER.** At the earliest practicable date, I shall provide a copy of this Agreement to every business enterprise for which I perform any employment, consulting or other professional or business activities during the two (2) year period following the termination of my employment with Company, provided that in no event shall I provide such an enterprise with a copy of this Agreement later than the first day of my employment by or performance of services for such enterprise.

9. **NOTIFICATION OF OTHER EMPLOYMENT.** I will notify Company of any other employment, consulting arrangement or other professional or business engagement accepted by me during the two (2) year period following the termination of my employment with Company that is in the same general business industry as Company or any Client to whom I was ever assigned, such notice is to be provided to Company's corporate headquarters, by certified mail, return receipt requested, no later than the close of the first business day following the date on which such acceptance occurs.

10. **ILLEGAL ACTIVITIES AND CAREGIVERS.**

   10.1. <u>UNLAWFUL ACTIVITIES</u>. I shall not engage in any unlawful activities while employed by Company and shall comply with all applicable laws, rules, regulations, decisions, and ordinances governing the operation of Company. Failure to do so may result in damages to Company, for which I may be liable. Notwithstanding the foregoing, I understand and recognize that Company's current Clients are engaged in business activities which, at present, are unlawful under federal law. I nonetheless agree to perform all activities which are legal under Colorado law and regulation (but may not be lawful under federal law) as directed by Company or Client. I acknowledge and accept all risk that federal, state, or local law or enforcement directives may change during the time of my employment, and hereby waive any claims (whether legal or equitable) against Company or its Client(s) for making any assignment or directive to me to engage in acts that are later deemed to be unlawful.

   10.2. <u>THEFT</u>. I acknowledge that Company has a zero tolerance policy regarding theft. Should Company or Client discover any information that would reasonably lead it to believe that I have taken anything at all from Company or Client, without express permission to do so; I shall be terminated without recourse and my conduct may be reported to law enforcement.

   10.3. <u>CAREGIVER</u>. I shall not act as a caregiver and/or cultivate any marijuana outside of the scope of my employment but for any such activities that are strictly in compliance of all applicable rules, laws, regulations, decisions, and ordinances.

11. **CRIMINAL BACKGROUND CHECK.** Upon the request of Company, I will cooperate in submitting to a criminal background check.

12. **MORAL CHARACTER.** I understand that I am required to maintain a high moral character. If I am dishonest in any way to Company, I understand that I may be immediately terminated.

13. **COMPLIANCE WITH COMPANY POLICIES.** I will comply with all policies of Company as set forth in Company's Employee Handbook or as otherwise dictated by Company. I acknowledge that I have received a copy of Company's Employee Handbook.

14. **AVOIDANCE OF APPEARANCE OF IMPROPRIETY.** I will not have any direct or indirect control, pecuniary interest, or membership in any club, organization, group, or entity that would compromise the

performance of my duties as set forth in Company's Employee Handbook and my job description unless a written disclosure of that direct or indirect control, interest, or membership has been made to Company and I have complied with any reasonable directions of Company in connection therewith. I will not hold any position for monetary or other reward that may reasonably be viewed by Company to conflict with my obligations and duties required under this Agreement.

15. HAZARDOUS MATERIALS/CONDITIONS, LAWFUL NOTICE. I understand and agree that during the course of my employment with Company, I may be exposed to many potentially hazardous conditions, chemicals, and materials associated with producing and procuring the inventory and goods of Company and its Clients, including but not limited to, exposure and risks associated with fertilizers, pesticides, fungicides, herbicides, oils, ethanol, caustics; blades and other sharp items; wet and slippery conditions and the risks associated therewith; and physical problems that may arise due to lifting heavy items. I voluntarily and knowingly assume such risks, and shall not hold Company or its Clients liable for any ill effects potentially related thereto.

16. SAFETY. I understand that because of the nature of Company's business, many potential safety hazards may exist at Company's facilities. I will perform all employment activities in compliance with the Occupational Safety and Health Act of 1970, and all federal, state, county and municipal laws, rules and regulations that are now, or may be in the future become, applicable to the performance of my employment. I will participate in safety training and compliance programs that meet or exceed OSHA standards and all applicable local, state and federal safety, health and environmental regulations. I shall promote good safety practices and eliminate hazards during the performance of my employment. I shall be responsible for reporting all incidents immediately to Company management. I shall be required to follow all the workplace rules and regulations set forth in Company's Employee Handbook, and perform my employment activities in a manner that provides a safe environment for all persons who may access the area where I perform any and all employment activities.

17. CITIZENSHIP. I warrant that I am a legal resident of the State of Colorado and that I am not an illegal alien in the United States of America. I understand that Colorado law may require certain residency requirements in order for me to be lawfully employed by Company. I hereby covenant to indemnify Company should any action be taken against Company regarding my legal residency status in the State of Colorado or my lawful presence in the United States of America.

18. GENERAL ACKNOWLEDGMENTS. I acknowledge that I am of good moral character, that I am over the age of 21, that I have not been convicted of a felony within the last 5 years, and that I have not, at any time, been convicted of a felony for drug possession, distribution or use (except for a felony drug charge based on possession or use of marijuana or marijuana concentrate that would not be considered a felony under current Colorado law). I also acknowledge that I am not a sheriff, deputy sheriff, police officer, prosecuting officer, or a state or local licensing authority or a member, inspector or employee thereof.

19. OCCUPATIONAL LICENSE. I understand that my employment with Company is contingent upon me obtaining and maintaining an Occupational License from the State. I will comply with all laws, rules, and regulations that pertain to my Occupational License.

20. NO PHOTOGRAPHY. I understand that it is strictly prohibited to take any still pictures, or to make any audio or visual recordings of any premises, inventory, equipment, personnel or operational procedures of Company or any of its Clients. I shall immediately report to management any such incidents witnessed by me.

21. GENERAL PROVISIONS.

21.1. GOVERNING LAW AND VENUE. This Agreement and any action related thereto will be governed, controlled, interpreted, and defined by and under the laws of the State of Colorado, without giving effect to any conflicts of laws principles that require the application of the law of a different state. I hereby expressly consent to the personal jurisdiction and venue of all state and federal courts located in the City and County of Denver, Colorado for any lawsuit filed there against me by Company arising from or related to this Agreement.

21.2. DISPUTE. In the event of any controversy or claim arising out of or relating to this Agreement, or

a breach thereof, the parties hereto shall first attempt to settle the dispute by mediation. If settlement is not reached within sixty (60) days after service of a written demand for mediation, any unresolved controversy or claim shall be settled by binding arbitration. The number of arbitrators shall be one. The place of arbitration shall be in Denver, Colorado. Colorado law shall apply. Judgment on the award rendered by the arbitrators may be entered in any court having jurisdiction thereof. The Company will initially pay any filing fee for arbitration, but if Company is deemed to be the prevailing party, it may also recover the full cost of arbitration.

21.3. ATTORNEYS' FEES. If a party shall commence any action or proceeding against another party relating to any controversy or claim arising out of or relating to this Agreement, the prevailing party shall be entitled to recover from the other party all reasonable costs in connection therewith, including reasonable attorneys' fees.

21.4. SEVERABILITY. If any provision of this Agreement is, for any reason, held to be invalid or unenforceable, it may be modified by any Court or arbitrator to the extent necessary to render it lawful, or otherwise severed. The other provisions of this Agreement will be unimpaired and the invalid or unenforceable provision will be deemed modified so that it is valid and enforceable to the maximum extent permitted by law, but only to the extent absolutely necessary to render the provision(s) enforceable and only in view of the parties' express desire that Company be protected to the greatest extent allowed by law from unfair competition and/or the misuse or disclosure of Confidential Records, Confidential Information and/or Company Inventions.

21.5. SURVIVAL. This Agreement shall survive the termination of my employment and the assignment of this Agreement by Company to any successor-in-interest or other assignee and be binding upon my heirs and legal representatives. This Agreement is and shall be freely assignable by Company in its sole discretion, at any time.

21.6. EMPLOYMENT. I agree and understand that nothing in this Agreement shall confer any right with respect to continuation of employment by Company, that I remain an "at-will" employee, and this Agreement shall not be construed so as to imply or create any legal obligation concerning the term of my employment, nor shall it interfere in any way with my right or Company's right to terminate my employment at any time, with or without cause and with or without advance notice.

21.7. NON-COMPETITION. I covenant and agree that, during the term of my employment with Company and for a period of six (6) months after termination thereof, regardless of the reason for the employment termination, I will not, directly or indirectly, anywhere within five (5) miles of any of Company's or its Client's business locations, perform the same or substantially the same employment duties on behalf of any business that is, in the sole discretion of Company, in substantially the same business industry as Company or its Client(s).

21.8. NOTICES. Each party must deliver all notices or other communications required or permitted under this Agreement in writing to the other party at the address listed on the signature page, by courier, by certified or registered mail (postage prepaid and return receipt requested), or by a nationally-recognized express mail service. Notice will be effective upon receipt or refusal of delivery. If delivered by certified or registered mail, any such notice will be considered to have been given five (5) business days after it was mailed, as evidenced by the postmark. If delivered by courier or express mail service, any such notice shall be considered to have been given on the delivery date reflected by the courier or express mail service receipt. Each party may change its address for receipt of notice by giving notice of such change to the other party.

21.9. INJUNCTIVE RELIEF. I acknowledge that if I breach any obligation under this Agreement, Company or Client will suffer immediate and irreparable harm and damage for which money alone cannot fully compensate Company or Client. I therefore agree that upon such breach or threatened breach of any obligation under this Agreement, Company or Client shall be entitled to a temporary restraining order, preliminary injunction, permanent injunction or other injunctive relief, without posting any bond or other security, compelling me to comply with any or all such provisions. This Section shall not be construed as an election of any remedy, or as a waiver of any right available to Company or Client under this Agreement or the law,

7

including the right to seek damages from me for a breach of any provision of this Agreement, nor shall this Section be construed to limit the rights or remedies available under applicable law or in equity for any violation of any provision of this Agreement, including, but not limited to claims for damages.

21.10. WAIVER. Any waiver or failure to enforce any provision of this Agreement on one occasion will not be deemed a waiver of any other provision or of such provision on any other occasion.

21.11. EXPORT. I agree not to export, directly or indirectly, any United States technical data acquired from Company or any products utilizing such data, to countries outside the United States, because such export could be in violation of the United States export laws or regulations.

21.12. ENTIRE AGREEMENT. The obligations pursuant to sections of this Agreement titled "Confidentiality" and "Inventions" shall apply to any time during which I was previously employed, or am in the future employed, by Company as an independent contractor if no other agreement governs nondisclosure and assignment of inventions during such period. This Agreement is the final, complete and exclusive agreement of the parties with respect to the subject matters hereof and supersedes and merges all prior communications between us with respect to such matters. No modification of or amendment to this Agreement, or any waiver of any rights under this Agreement, will be effective unless in writing and signed by me and the Manager of Company. Any subsequent change or changes in my duties, salary or compensation will not affect the validity or scope of this Agreement.

*I acknowledge that I have read and understand this Agreement and have been given the opportunity to discuss it with my own independent legal counsel. This Agreement shall be effective as of the first day of my employment with Company.*

EMPLOYEE:

By: *David K Jenson*
Name: David K. Jenson
Its: Asset Protection Associate
Dated: 04/13/2016

COMPANY:

By: *Heidi Fegel*
Name: Heidi Fegel
Its: HR Coordinator
Dated: 04/13/2016

8

# EXHIBIT A

TO: TGS Management, LLC
FROM: Keith Jenson
DATE: 04/13/2016
SUBJECT: Previous Inventions

1. Except as listed in Section 2 below, the following is a complete list of all inventions or improvements relevant to the subject matter of my employment by Company that have been made or conceived or first reduced to practice by me alone or jointly with others prior to my engagement by Company:

[✓] No inventions or improvements.

[ ] See below:

_____
_____
_____

[ ] Additional sheets attached.

2. Due to a prior confidentiality agreement, I cannot complete the disclosure under Section 1 above with respect to inventions or improvements generally listed below, the proprietary rights and duty of confidentiality with respect to which I owe to the following party(ies):

| Invention or Improvement | Party(ies) | Relationship |
|---|---|---|
| 1. | | |
| 2. | | |
| 3. | | |

[ ] Additional sheets attached.