FILED
U.S. DISTRICT COURT
DISTRICT OF COLORADO

2018 SEP 10 PM 2: 46

JEFFREY P. COLWELL
CLERK

BY_____DEP. CLK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

**Magistrate Judge Michael E. Hegarty**

Civil Action No. 18-cv-01240-MEH

DAVID KEITH JENSON, Pro se litigant

Plaintiff,

v.

THE GREEN SOLUTION (TGS) and

EDDIE CARRARO,

Defendants,

---

## PLAINTIFF'S RESPONSE TO RESPONDENT'S DEMAND FOR MEDIATION/ARBITRATION DEMAND TO STAY LITIGATION

---

The defendants have produced several precedent cases that successfully forced arbitration, eleven cases I believe in total. Mr. Jenson finds all of these cases to be irrelevant to this case and he opposes Defendant's Demand for Mediation and Demand to Stay Litigation in District Court on the following grounds:

1. The employment agreement Mr. Jenson signed (Defendant's exhibit 1), does not contain any language whatsoever regarding TGS prohibiting discrimination, hostile work environment, and retaliation, based on age, race, color, gender or religion. TGS' employment agreement does not contain the names or acronyms of federal or state agencies such as: Title VII, EEOC, CCRD, or ADEA etc., that protect certain groups against employment discrimination. Therefore, TGS effectuated a substantive waiver of Mr. Jenson's federally protected statutory rights. The employment agreement Mr. Jenson signed covered only the

1

topics contained in paragraphs 1 through 21.12 and only those topics did Mr. Jenson agree to be arbitrable. In this case, mediation/arbitration lacks jurisdiction over Mr. Jenson's federally protected statutory rights.

2.      The Supreme Court decision in *Kravar v. Triangle Servs., Inc.,* Civ. No. 1:06-cv-07858, 2009 WL 1392595, at *1 (S.D.N.Y. May 19, 2009) (Kravar III), Kravar opposed Triangle's motion to compel arbitration. Among other things, Kravar argued that the arbitration clause was unenforceable because it gave the union complete control over whether, and how, to arbitrate an individual's statutory claim. See id. at *3 n.1 (noting that Kravar argued the CBA's arbitration clause "puts the employee at the mercy of his or her union, which may be indifferent or even hostile to the employee's claim of individual discrimination"). Kravar also opposed the motion on the ground that the CBA's arbitration clause limited the relief an arbitrator could award a prevailing employee, depriving employees of the full range of statutory remedies available under federal law. See Kravar Memorandum in Opposition 14, June 8, 2007 (R.16).

3.      The district court denied Triangle's motion to compel arbitration. Kravar I, 509 F. Supp. 2d at 408-09. Without addressing Kravar's arguments concerning the particular inadequacies of the arbitration clause, the district court held that the CBA's arbitration clause was unenforceable under *Alexander v. Gardner-Denver Co.*, 415 U.S. 36 (1974), and this Court's recent decision in *Pyett v. Pennsylvania Building Co.*, 498 F.3d 88 (2d Cir. 2007), rev'd sub nom. *14 Penn Plaza v. Pyett,* U.S. 129 S. Ct. 1456 (2009). See Kravar I, 509 F. Supp. 2d at 408-09. After the Supreme Court issued its decision in 14 Penn Plaza v. Pyett, Triangle sent Kravar a letter offering to let her use the CBA's grievance and arbitration procedures to

pursue her claim of disability discrimination.  See Letter from Mark N. Reinharz to Darnley D. Stewart dated April 20, 2009 (JA459-461).

4.    Triangle then renewed its motion to compel arbitration (JA455).  Triangle argued that, in light of the Supreme Court's decision in Pyett upholding the identical arbitration provision and the company's recent offer to permit Kravar to grieve and arbitrate her ADA claim, the district court should defer the matter "to the grievance arbitration procedure of the collective bargaining agreement."  See Triangle's Memorandum in Support of Motion to Dismiss 6-8, April 22, 2009 (R.57).  The District Court denied Triangle's motion, finding that the CBA effectuated a substantive waiver of Kravar's federally protected statutory rights. *Kravar III*, 2009 WL 1392595.

5.    There are three requirements for a retaliation claim: protective activity, adverse action, and causal connection.  In the Gardner-Denver case, the union contract said that it prohibited discrimination, but it did not specifically reference the federal statute by name. However, in Penn Plaza, the arbitration agreement specifically referenced the ADEA. Consequently, the Penn Plaza case involved arbitrating a statutory, not a contractual, claim. In the eyes of the average person, that may be a distinction without much merit. An employee may view an agreement that says, "There will not be age discrimination" and an agreement that says, "There will not be discrimination based on the ADEA" in the same way, but the Court ruled that there is a key difference."

6.    Unlike the Kravar case, TGS' employment agreement did not contain language specifying any policy opposing discrimination, hostile work environment and retaliation based or age, race, color, gender or religion, nor did the employment agreement identify any federal or

state agencies i.e. EEOC, CCRD or ADEA.  Mr. Jenson holds firm to the position that his federal protected statutory complaints in this case are not arbitrable.

7.     TGS breached the employment agreement Mr. Jenson signed in April 2016, and effectively voided said employment agreement by refusing to immediately report Mr. Jenson's alleged illegal activity to law enforcement as mandated in the employment agreement.  Page 4 of the employment agreement, paragraph 3.2 Colorado and Federal Law, clearly states, "…**Company and/or Client will immediately report any suspected illegal activity by me to law enforcement…**"  TGS terminated Mr. Jenson for the alleged act of attempted extortion, a felony offense.

8.     TGS' unilateral failure and refusal to immediately notify law enforcement denied the plaintiff the due process of an independent investigation, the only way to clear his name from TGS' defaming and felonious accusations against him.  Moreover, by failing to report the plaintiffs alleged felony activity, TGS assumed the role of judge, jury and executioner when they fired Mr. Jenson without investigating pertinent facts regarding Mr. Jenson's discrimination claims and failing to immediately report his illegal activity to law enforcement.  Mr. Jenson maintains that at all times during his employment with TGS he performed all of his contractual obligations contained in the employment agreement.

9.     Human resources vice president Eddie Carraro maliciously acted with a blatant and reckless disregard for the truth when he failed to consider all pertinent facts prior to terminating Mr. Jenson's employment for attempted extortion.  Again, TGS voided the contractual employment agreement by refusing to immediately report any illegal activity committed by Mr. Jenson to law enforcement mandated by paragraph 3.2 of the employment agreement,

thus denying Mr. Jenson due process of having all facts presented to an independent law
enforcement agency before unilaterally labeling the plaintiff a felon.

10.    TGS and Eddie Carraro libeled and slandered Mr. Jenson's reputation and fiduciary
worthiness when they communicated in writing with the Colorado Division of Employment
and the Colorado Civil Rights Division (CCRD) that Mr. Jenson was terminated for
committing a felonious act. Mr. Jenson believes that Truth is an absolute defense against
libel and slander. In a jury trial, the factual evidence of this case will reveal that TGS and
Mr. Carraro excluded several pertinent facts that demonstrate Mr. Jenson had been subjected
to multiple tangible employment actions by the defendants, the plaintiff believed violated
his Title VII, Section 1981, CRA of 1886 and AEDA rights and protections.

11.    Having prior first-hand experience dealing with workplace discrimination, the plaintiff
possessed knowledge of the remedies afforded to him under Section 1981 CRA of 1866. Mr.
Jenson understood that retaliatory tangible employment actions taken against an employee
who is grieving about discrimination include uncapped remedies in the way of
compensatory and punitive damages. After Mr. Carraro verbally asked Mr. Jenson, "What
will it take to resolve this employment matter?" Mr. Jenson did nothing wrong when he
responded with his $600,000.00 settlement offer. Simply because the defendants didn't like
or agree with the plaintiff's requested settlement amount doesn't mean he committed the act
of extortion, especially when all of the facts pertinent to this case are considered.

12.    The fact Eddie Carraro suspended Mr. Jenson immediately after he communicated his
employment discrimination grievances to manager Matthew Smith, establishes Mr. Jenson
was engaged in protected activity and the close proximity of the tangible employment
action. By firing the plaintiff for a felonious act, TGS and Eddie Carraro should have

known this accusation would have negative effects on the plaintiff's character and cause irreparable harm to Mr. Jenson's personal reputation, fiduciary worthiness and future employment opportunities; tort injuries that cannot be remedied through mediation/arbitration. Only District Court with its plenary authority can restore Mr. Jenson's personal reputation and fiduciary worthiness.

13.     TGS and Eddie Carraro hold vicarious liability when they subjected Mr. Jenson to at least three separate tangible employment actions prior to his termination all while Mr. Jenson engaged in protected opposition to discriminatory employment practices. In *Burlington Industries, Inc. v. Ellerth*, 118 S. Ct. 2257 (1998), and *Faragher v. City of Boca Raton*, 118 S. Ct. 2275 (1998), the Supreme Court made clear that employers are subject to vicarious liability for unlawful harassment by supervisors. The standard of liability set forth in these decisions is premised on two principles: 1) an employer is responsible for the acts of its supervisors, and 2) employers should be encouraged to prevent harassment and employees should be encouraged to avoid or limit the harm from harassment. In order to accommodate these principles, the Court held that an employer is always liable for a supervisor's harassment if it culminates in a tangible employment action.

14.     On or around October 14, 2016, Mr. Jenson emailed his manager, Justin Towers (Exhibit 2 aka A-21), requesting his manager's help in prioritizing his job duties that Mr. Jenson believed to be unfair and unbalanced compared to other similarly situated APAs.   Mr. Jenson, the only African-American asset protection associate (APA) employed by TGS at that time, was also the only APA who had the responsibility for two retail stores.  All of the other APA's were only given the responsibilities for one retail store compared to the Plaintiff's two retail stores.  The unfair and unsolicited expansion of plaintiff's job

assignments required Mr. Jenson to satisfactorily complete all of his assigned job duties for each store in less than four hours per day while the other APAs were given eight hours per day to complete half the job duties of Mr. Jenson.

15. Mr. Towers never responded directly to Mr. Jenson's email request for managerial help. However four days later, on October 18, 2016, at 3:00 pm, (Exhibit 4), Mr. Jenson received a text message from cash coordinator Lou Crawford asking for permission to call the plaintiff directly. Ms. Crawford called Mr. Jenson later that day on October 18, 2016, providing the plaintiff a heads up that Justin Towers had just instructed her to inform Mr. Jenson that his job duties had been modified to now include being the back-up cash coordinator under Lou Crawford, in addition to his regular APA duties.

16. On November 7, 2016, at 11:03 am, Ms. Crawford memorialized these facts in a separate electronic text message stating, "Well I was reaching out to you because I'm on PTO all next week and when I asked Justin (Towers) who's covering my Garda and transport duties, he told me that he'd like you to be the one. Do you have a problem with working 8:00-4:30 Mon-Fri next week and covering those duties in the AM and going to Potomac in the PM (do you still cover Havana?)" What hurt the plaintiff most was that after requesting managerial help from his manager, Mr. Towers responded by using a surrogate employee (Ms. Crawford) someone outside the plaintiff's chain of command, to add additional responsibilities to Mr. Jenson's already unfair and unbalanced workload by assigning him to include the duties of cash coordinator, an exempt position outside of the plaintiff's job description, and a job that Mr. Jenson never applied for.

17. Mr. Towers is quick to point out that Mr. Jenson was a non-exempt employee but had no hesitation of assigning him the duties of the exempt position of cash coordinator. All the

while holding him fully accountable for his APA duties without increase to his pay, or human resources authorization, this action violated Mr. Jenson's Title VII and Section 1981 rights. Mr. Towers testified in paragraph 4 of his sworn affidavit testimony (Exhibit 6, paragraph 4) that, "…He was only an hourly, non-exempt employee…" Instead of helping Mr. Jenson manage his already unfair workload, Mr. Towers added to it by illegally adding the responsibilities of managing a daily cash balance of $132,000 per day (Exhibit 8), and over one million dollars per week in cash deposits without an increase in pay. During this period of time, Mr. Towers never directly spoke to Mr. Jenson leaving him to succeed or fail without his involvement or managerial support.

18.  The plaintiff perceived the intentional change to his job duties without human resources involvement represented a retaliatory and tangible employment action taken by his manager Justin Towers. In 2006, *Burlington Northern and Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006), the Supreme Court said that a retaliation claim does not need to involve a tangible employment action, like a discharge, to be actionable. Instead, it said that a material change of terms and conditions of employment, which could mean excluding someone from career-development opportunities, could also be retaliation. By broadly defining the concept of adverse action in this case, the Supreme Court opened the door to retaliation claims.

19.  On October 26, 2016, Mr. Jenson attempted to use the Company's open door policy to address his discrimination grievances with Nick Spiedel, chief information security officer (CISO), but was instructed by Katie Math, Mr. Spiedel's administrative assistant, to first setup a meeting with Justin Towers and safety manager, Greg Sullivan, and a meeting was scheduled for November 8, 2016. However, on November 8, 2016, instead of discussing Mr. Jenson's employment concerns, Mr. Towers delivered a final written warning to Mr.

Jenson for a November 3, 2016 security incident in which Mr. Jenson was operating within the full scope and authority of Marijuana Enforcement Division (MED) laws, rules and regulations and Colorado security statutes. Moreover, the Aurora Police Department (APD) investigated the November 3, 2016 security incident and found no wrongdoing whatsoever on Mr. Jenson's part. The plaintiff considered Mr. Towers' November 8, 2016 final written warning to be an act of retaliation for attempting to go above his head by using the open door policy and represented a second tangible employment action against Mr. Jenson. From that point until Mr. Jenson's termination, the plaintiff made numerous attempts to escalate his employment discrimination grievances to TGS managers and human resources but the company lacked an effective discrimination grievance process other than requiring the harassed employee to grieve to the harassing manager. The facts will reveal the more Mr. Jenson complained and the higher his complaints reached the more severe the retaliation and adverse employment actions befell Mr. Jenson by the hands of TGS managers Towers, Sullivan and Carraro.

20.    On December 6, 2016, Mr. Jenson was suspended immediately after communicating his discrimination grievances and public safety concerns to TGS manager Matthew Smith. Human resources refused to meet with or talk to Mr. Jenson until only after the plaintiff had been suspended representing the third tangible employment action against Mr. Jenson. Furthermore, human resources are basic employment benefits and services that are supposedly provided to all TGS employees. However, no other similarly situated employees at TGS had been denied the basic benefits and services provided by human resources except Mr. Jenson. TGS' failure to provide a safe haven where the plaintiff could officially grieve his discrimination complaints is an example of the defendant's failure to

exercise reasonable care to stop and prevent Mr. Jenson's unwanted discriminatory harassment. Furthermore, TGS' denial of basic human resources services offered to all other similarly situated employees, unfairly and unilaterally modified the terms and conditions of the plaintiff's employment.

21. TGS managers Chris Aderhold and Greg Sullivan failed to escalate Mr. Jenson's discrimination complaints to human resources after he complained to them on November 25, 2016 and November 29, 2016 respectively.

22. On December 6, 2016, TGS manager Matthew Smith finally escalated Mr. Jenson's discrimination grievances to TGS vice president of human resources, Eddie Carraro. Instead of protecting the plaintiff or investigate any of his discrimination complaints, Mr. Carraro fabricated the story that Mr. Jenson called TGS manager Greg Sullivan on December 6, 2016 and threatened to harm TGS by going to the media. Mr. Carraro's sworn affidavit testimony contains the following statement. "On December 6, 2016, I received a call from Greg Sullivan, the general manager of the retail location for the Green Solution, LLC ("TGS") located on Grape Street, Denver, Colorado. Mr. Sullivan reported to me that a new asset protection associate, David Jenson, had made various comments to him at the beginning of his shift that the company was operating illegally, that he had tried to make complaints about this activity, but was being ignored, and that he intended to harm the company and prove he was right. After quickly reviewing Mr. Jenson's file, I informed Mr. Sullivan that Mr. Jenson should be sent home and suspended until I can have a conversation with him."

23. First of all, Mr. Carraro completely fabricated the facts to justify suspending Mr. Jenson. The fact remains the last communication between Mr. Jenson and Mr. Sullivan occurred on

November 29, 2016. Mr. Jenson demands that Eddie Carraro prove that the plaintiff communicated with Mr. Sullivan in any way on December 6, 2016 via phone records, video footage, email, etc. Secondly, Mr. Carraro intentionally and maliciously omitted the discrimination complaints Mr. Jenson communicated to TGS manager Matthew Smith on December 6, 2016. As the highest ranking human resources representative accessible to the plaintiff, Eddie Carraro should have known to investigate all aspects of Mr. Jenson's complaints of discrimination. Instead of protecting Mr. Jenson's statutory rights, Mr. Carraro used evidence he fabricated to justify suspending, then terminating, the plaintiff's employment.

24.     Since arbitration or mediation has not yet commenced, Mr. Jenson believes that District Court, with its plenary power to enforce statutory rights, is the appropriate forum to seek remedies for the intentional and pervasive racial discrimination suffered by the hands of TGS managers Justin Towers, Greg Sullivan and Eddie Carraro. Arbitrators have no jurisdiction to hear and rule on Section 1981 CRA of 1866 claims. Therefore, the plaintiff believes that forced participation in contractual arbitration/mediation for his Title VII complaints would place Mr. Jenson in the unsustainable position of requiring a trial de novo in district court to address his Section 1981 CRA of 1866 complaints. The Supreme Court decision in *Alexander v. Gardner-Denver Co.* chose an extreme and inflexible approach, holding that under no circumstances may the plenary jurisdiction of federal courts over claims of discrimination under Title VII give way to an arbitral determination. Justice Powell, writing for a unanimous Court stressed, "The intention of Congress to entrust final responsibility for enforcement of Title VII to the federal courts, regardless of the actions of the EEOC or private arbitrators. Therefore, no procedural barriers could be erected to

obstruct individual access to the plenary powers of the courts.  He rejected in turn arguments based on election of remedies, waiver, and the federal policy favoring private arbitration of labor disputes."   Justice Powell treated summarily the arguments advanced in support of a strict preclusion rule. He reasoned that, "The clear import of Title VII's legislative history, and that of analogous legislative enactments, was to accord parallel or overlapping remedies against discrimination where various statutory rights could be pursued independently. Because submission of a claim to one of the available public forums, such as a state fair employment agency, generally did not preclude later submission to another, such as the EEOC or the courts, the inference is strong."  Justice Powell concluded, "That prior submission to a private forum, such as arbitration, similarly should not preclude an individual's resort to the courts. Moreover, arbitration involves the pursuit of distinct contractual rights"; by contrast, Justice Powell argued: "In filing a lawsuit under Title VII, an employee asserts independent statutory rights accorded by Congress."  Analogizing to the situation under the LMRA in which the NLRB is not precluded from consideration of unfair labor practice charges subsequent to submission of a contractual dispute to arbitration where the statutory right underlying a particular claim may not be abridged by contractual agreement.  Justice Powell deemed the election of remedies doctrine wholly inapplicable. He distinguished this intentional change in the plaintiff's job duties represented a tangible employment action. "The individual rights protected by Title VII, which exist apart from the process of collective bargaining and cannot be forfeited."

## ARGUMENTS

25.   TGS' employment agreement contained vague language that was too broad in scope to have jurisdiction over the plaintiff's statutory rights and protections. TGS' employment agreement the plaintiff signed lacked specific language prohibiting discrimination, hostile work environment or retaliation based on age, race, color, gender or religion. Neither did the employment agreement contain the names or acronyms of any federal or state agencies such as Title VII, EEOC, CCRD or AEDA.

26.   TGS effectuated a substantive waiver of Mr. Jenson's federally protected statutory rights. The employment agreement Mr. Jenson signed covered only the topics contained in paragraphs 1 through 21.12 and only those topics did Mr. Jenson agree to arbitrable. Therefore, in this case, mediation/arbitration lacks jurisdiction over Mr. Jenson's federally protected statutory rights.

27.   Mr. Jenson also opposes the defendant's motion to demand mediation/arbitration on the ground that the arbitration clause seeks to limit the relief an arbitrator can award a prevailing employee, depriving Mr. Jenson of the full range of statutory remedies available under federal law. See the Supreme Court decision in *Kravar v. Triangle Servs., Inc.,* Civ. No. 1:06-cv-07858, 2009 WL 1392595, at *1 (S.D.N.Y. May 19, 2009). TGS breached its own employment agreement the plaintiff signed in April 2016 when the defendants failed to immediately notify law enforcement after terminating the employee for allegedly engaging in illegal (felonious) activities. (See paragraph 3.2 of the employment agreement, defendant's (Exhibit 1). This unilateral action taken by TGS effectively voided the employment agreement rendering it invalid and unenforceable.

28.   TGS' intentional and malicious actions surrounding Mr. Jenson's suspension and termination has resulted in tort liabilities of libel and slander to Mr. Jenson's personal reputation and fiduciary worthiness.  Again, Mr. Jenson believes his personal injuries sustained by the hands of TGS and Eddie Carraro cannot be adjudicated or remedied through the arbitration process.  Mr. Jenson believes he is entitled to the opportunity to legally clear his personal reputation and fiduciary worthiness.

29.   Mr. Carraro's affidavit testimony (Exhibit 10 paragraph 4), provides the Prima facie claim used to suspend the plaintiff when stated, "...Mr. Jenson, had made previous comments to him at the beginning of his shift that the Company was operating illegally, that he had tried to make complaints about this activity but was being ignored, and that he intended to harm the company and prove he was right...", requires more illumination.  First, Mr. Jenson never made those comments.  Mr. Jenson told TGS manager Matthew Smith on December 6, 2016 was, "If human resources won't meet with me by December 22, 2016, I will report TGS' activity to the EEOC and the Marijuana Enforcement Division (MED)."  As holder of a MED "Key Employee" license, Mr. Jenson is morally and contractually obligated to ensure MED regulations are being adhered to.  MED regulation R 604-Retail Marijuana Products Manufacturing Facility (MIP): Health and Safety Regulations, paragraph F, Additives – "A Retail Marijuana Products Manufacturing Facility (MIP) shall not include any Additive that is toxic within a Retail Marijuana Product; nor include any additive for the purposes of making this product more addictive, appealing to children, or misleading to consumers."

30.   On November 28, 2016, facility security coordinator, Justin Allen, sent pictures (Exhibit 12) of a blue bottle of alpha pinene, a toxin suspected of being used in the manufacture of regulated marijuana products, to Mr. Jenson's cell phone.  Mr. Allen claimed he took the

pictures at TGS' Marijuana Infusion Products (MIP) facility. Mr. Allen also showed Mr.
Jenson the date, time and address stamp that displayed on his phone which confirmed when
and where the photos were taken. Mr. Jenson strongly believed he was fulfilling his
obligation to public safety when he challenged TGS' authorization to use alpha pinene in the
manufacturing of their regulated marijuana products.

31.    Again, once Mr. Jenson had obtained knowledge of this suspected activity, he was obligated
to notify TGS of his findings, and he did so on November 29, 2016 (Exhibit 12-B). Later
that day, TGS safety manager, Greg Sullivan, admitted to the plaintiff that "TGS had the
right to dilute the toxin to acceptable levels. Mr. Jenson maintains he did nothing wrong
when he told manager Matthew Smith that he would report TGS' activities to the EEOC and
MED. The plaintiff further acknowledges that up to this point in time, has not caused any
harm to TGS.

32.    Mr. Jenson challenges TGS and Greg Sullivan's authority to arbitrarily dilute and use the
alpha pinene toxin to what they perceive to be acceptable levels, without transferring the
same warning labels found on the labeling of the parent toxin onto the TGS packaging
containing the diluted toxin. Customers who choose to legally consume marijuana in
Colorado expect and deserve to purchase marijuana products free from toxins. Mr. Jenson
maintains the position that if TGS chooses to use toxic additives, they are obligated to
provide warnings of the side effects and risks associated with said toxins. That way, the
consumer can make an informed decision of whether or not that product is right for them.
Again, Mr. Jenson believes District Court and trial by jury is the appropriate venue to hear
and rule on such matters involving public safety and consumer protection. Moreover, Mr.
Jenson deserves the right to be judged by a jury of his peers, to determine if the plaintiff

15

fulfilled his obligation to enforce public safety and MED laws, rules and regulations, in the effort to clear his name and reputation.

33.    TGS and Eddie Carraro hold vicarious liability under Title VII for failing to report, stop and protect Mr. Jenson from discriminatory employment practices, hostile work environment and retaliation by TGS managers Justin Towers, Greg Sullivan and Eddie Carraro.  Despite Mr. Jenson's numerous attempts to exercise reasonable care by notifying three separate TGS managers, (Aderhold, Sullivan, & Smith) and attempted notifications to three human resources officials (Carraro, Feigel and Faulk) about the unwanted harassment the plaintiff perceived to be based on racial animas, it was the defendants who failed to exercise reasonable care.  The defendants failed to stop and promptly correct the discriminatory and harassing behavior once given the opportunity.

34.    Mr. Carraro's credibility is severely damaged by his March 23, 2017 affidavit testimony.  In paragraph 12, Carraro testified, "I have reviewed the Company's records for Mr. Jenson, as well as the Company's records concerning discrimination and retaliation.  There is no record of Mr. Jenson submitting an allegation or claim of discrimination or retaliation to the Company at any time prior to his termination."  Former TGS manager Chris Aderhold's July 10, 2017 sworn affidavit testimony not only contradicts Mr. Carraro's sworn testimony but also challenges Mr. Carraro's overall credibility and motivation.

35.    On December 7, 2016, prior to his December 12, 2016 termination,   Mr. Jenson emailed Mr. Carraro a memorandum of conversation regarding his November 29, 2016 conversation with Greg Sullivan (Exhibit 14, page 4, unfair employment opportunities).  During that conversation, Mr. Jenson voiced his concerns to Mr. Sullivan regarding unfair employment opportunities.  Mr. Jenson stated in the document he sent to Mr. Carraro on December 6,

2016, "I must tell you Greg, there are federals employment laws governing companies employing more than 40 individuals like the EEOC Title VII that protects against this sort of employment treatment and, as a member of a protected employment class, it is concerning to me to see all these positions being filled without an equal opportunity to obtain them."

36. The plaintiff finds the fact Mr. Carraro received this information and found it to be irrelevant and insufficient to follow up or ask additional questions, represents a dereliction of his duty. As such, the defendants failed to exercise reasonable care and do not meet the burden of the Faragher/Ellerth defense and are not entitled to any affirmative defenses including the demand to force mediation/arbitration. See *Faragher v. City of Boca Raton,* 524 U.S. 775 (1998), and *Burlington Industries Inc. v. Ellerth,* 524 U.S. 742 (1998).

37. After Mr. Carraro was notified on December 6, 2016, by TGS manager Matthew Smith regarding the plaintiff's complaining testimony. Mr. Smith's sworn affidavit testimony (Exhibit 16, paragraph 6) clearly states, "Mr. Jenson threatened that he did not believe he was not being taken seriously and that people were not taking action on his complaints." Mr. Jenson was referring to human resources refusal to see him after he complained to managers Aderhold and Sullivan on November 25, 2016 and November 29, 2016 respectively. Why this information was rendered irrelevant and insufficient by Mr. Carraro is a question the defendants need to answer. Instead of exercising due diligence by interviewing the plaintiff, Mr. Carraro proceeded to suspend Mr. Jenson prior to ever speaking to him. Mr. Carraro also failed to interview any of the alleged harassing managers (Towers and Sullivan).

38.    Mr. Carraro also failed to interview manager Chris Aderhold whom Mr. Jenson specifically told manager Matthew Smith he had previously complained to on November 25, 2016. Mr. Jenson is unclear as to what information Mr. Smith communicated to Mr. Carraro but he is certain it did not include his November 25, 2016 complaint to manager Chris Aderhold. Mr. Smith is being untruthful when he stated in paragraph 9 of his sworn affidavit testimony, "At no time during his employment did Mr. Jenson ever complain to me that he felt he was being discriminated against, either because of his race or his age…"

39.    More importantly, TGS lacked an effective complaint process by which Mr. Jenson could grieve his discrimination complaints. All of Mr. Jenson's attempts to complain were rendered ineffective by a grievance process requiring the employee to grieve to the harassing managers. Mr. Carraro's failure to conduct a proper and thorough investigation into Mr. Jenson's discrimination complaints prior to taking tangible employment actions against him represented an inconclusive, unilateral and unfair rush to judgment by the defendants.

## CONCLUSION

40.    This is not a case of a rouge supervisor exercising poor judgment and straying off course. This case represents pervasive and systemic racial animas that permeated throughout the corporate culture all the way to the executive level of TGS management. Mr. Jenson argues simply because the defendants never called the plaintiff the "N" word to his face but instead chose to treat him like "one" as a condition of his continued employment is still discrimination and retaliation based on race. The discrimination that TGS managers Towers and Sullivan subjected Mr. Jenson to was wrong. However, the attempted cover up of the discriminatory actions by human resources vice president Eddie Carraro is both

inexcusable and indefensible. TGS' tenacious, nine month opposition to Mr. Jenson's application for unemployment benefits after his termination demonstrates the severity of Mr. Carraro's discriminatory animas he held towards the plaintiff.

41.    TGS did not contest the unemployment benefits of former employee Justin Allen, a Caucasian employee who was terminated for theft. Paragraph 10.2 of the employment agreement Theft states, "I acknowledge that the Company has zero tolerance policy regarding theft. Should company or client discover any information that would reasonably believe that I have taken anything at all from Company or Client, without expressed permission to do so, I shall be terminated without recourse and my conduct will be reported to law enforcement."

42.    Despite the assurance provided by paragraph 10.2 of the employment agreement guaranteeing TGS to be held free from recourse when it came to terminating an employee for theft, TGS did not contest or oppose the unemployment benefits of Mr. Allen, an admitted thief. However, the defendants chose to contest and ultimately deny Mr. Jenson's claim for unemployment benefits and by doing so, the defendants denied the plaintiff and his family much needed financial assistance that Mr. Jenson had earned depriving his family of the continuity of financial stability. When it came to the matter of unemployment benefits, the defendants did not treat the two similarly situated employees equally. The only distinguishable differences between these two similarly situated employees were age, race and the fact Mr. Jenson had previously grieved to TGS managers about his perceived employment discrimination based on race.

43.    The facts of this case have revealed that TGS had it out for Mr. Jenson from his initial interview with the Company when TGS manager Greg Sullivan told Mr. Jenson during his

interview that he lacked the requisite aptitude for the Facilities Security Coordinator position and gave the job to a younger, less qualified Caucasian candidate. These facts are supported by Chris Aderhold's July 10, 2017 sworn affidavit (Exhibit 18). Mr. Aderhold testified in paragraph 3, "Yes, Mr. Jenson did inform me that he felt discriminated against when it was announced that Justin Allen had been named (whom in my opinion was a less qualified employee) was promoted to facility Security Coordinator."

44.      In paragraph 5, Mr. Aderhold expanded his point by stating, "In my professional opinion as a former manager at TGS management, Mr. Jenson's education and experience far exceeded Mr. Allen's in most every way. This very much appeared to me to be favoritism of Mr. Allen by some at TGS management when it came to this position specifically." Mr. Aderhold's affidavit testimony corroborates nearly every aspect of Mr. Jenson's testimony and complaints. The simple fact that Mr. Carraro refused to follow up with any of the managers Mr. Jenson told Mr. Smith about on December 6, 2016, is inexcusable and again, leaves TGS holding vicarious liability for the employment discrimination and retaliation suffered by Mr. Jenson as well as the compensatory damages he incurred.

PRAYER

Mr. Carraro's decision making regarding Mr. Jenson's discrimination claims demonstrated incompetence on a level far beneath his office. The harm he caused the plaintiff was malicious and intentional and both Mr. Jenson and the defendants deserve their day in court! Moreover: 1. TGS effectuated a substantive waiver of Mr. Jenson's federally protected statutory rights by using broad and non specific language in their employment agreement. 2. TGS breached the employment agreement when they failed to meet their obligation to immediately notify law enforcement of defendant's alleged illegal activities. 3. Mr. Jenson's complaints have expanded well beyond simple employment grievances into tort liabilities of slander and libel, legal areas where arbitration lacks

jurisdiction to hear and render a ruling on.  Only District Court has the plenary power clear

Mr. Jenson's reputation and fiduciary worthiness from TGS' accusation of attempted

extortion.

***This document was prepared and written in third person by the Pro se plaintiff David Keith Jenson, for his convenience.***

Dated September 7, 2018 in Aurora, Colorado.

David Keith Jenson


STATE OF COLORADO                    )


CITY & COUNTY OF DENVER        )
The foregoing instrument was acknowledged before me this 7th day of September, 2018 by David Keith Jenson.

Witness my hand and official seal.

Notary Public

ANDY RODRIGUEZ
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20164027440
MY COMMISSION EXPIRES July 20, 2020

My commission expires: July 20, 2020


CC:  J. Evan Gibbs
     Troutman Sanders LLP
     600 Peachtree Street NE, Suite 3000
     Atlanta, GA  30308-2216
     Attorney for the Defendants
     VIA: USPS and Electronic delivery (email)